|  |  |  |
|---|---|---|
| DEFENDING ANIMAL RIGHTS TODAY AND TOMORROW, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 11-0786 (ABJ) |
| WASHINGTON SPORTS AND ENTERTAINMENT, LP, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

# MEMORANDUM OPINION

Every year, the Ringling Bros. and Barnum & Bailey Circus makes an appearance under the big top at the Verizon Center in the District of Columbia. Every year, it attracts a crowd of parents and children, cotton candy vendors, and animal rights activists. In 2011, the circus came to town on March 24. Compl. ¶ 8. And on that date, members of plaintiff organization Defending Animal Rights Today and Tomorrow ("DARTT") were on hand to provide information concerning the treatment of animals to circus patrons as they left the performance. Compl. ¶ 10.

DARTT members were permitted to utilize a variety of media to communicate their message: they were wearing signs, they displayed images on the side of the Verizon Center building with a video projector, they were equipped with megaphones to amplify their spoken comments, and they handed out leaflets. But DARTT brings this lawsuit alleging that defendants Washington Sports and Entertainment ("WSE") and the District of Columbia ("D.C." or "the District") violated its rights under the First Amendment to the U.S. Constitution because the

protesters were directed to move their leafleting activity from their chosen location under the overhang directly outside the Verizon Center doors to other points on the F Street sidewalk. Since both the circus and the leafleting had come to an end before this action was filed, the Court denied plaintiff's motion for preliminary injunction on May 24, 2011. *Defending Animal Rights Today and Tomorrow v. Wash. Sports and Entm't, LP, et al.*, No. 11-cv-00786, 2011 WL 2020788, at * 3 (D.D.C. May 24, 2011) [Dkt. #14]. Defendants have now moved to dismiss the complaint or, in the alternative, for summary judgment [Dkt. #17 and #19]. The parties each submitted declarations in support of their positions, and WSE provided the Court with unedited surveillance video from the dates and times at issue, which depicts the scene outside the Verizon Center when the circus concluded. Ex. A to Touhey Decl. The Court heard oral argument on defendants' motions on September 8, 2011. For the reasons stated below, the Court will grant defendants' motions, and this case will be dismissed. Since plaintiff's lawful protest activities were neither prohibited nor impeded, the First Amendment was alive and well on F Street in March of 2011.

**BACKGROUND**

The Verizon Center is a sports and entertainment arena located at 601 F Street, N.W., Washington, D.C. Since 2009, DARTT has held protests at the Verizon Center when the Ringling Bros. circus was in residence to inform attendees about "Ringling's cruel treatment of animals." Compl. ¶ 10; Ortberg ¶ Decl. 2–3. DARRT intends to stage similar protests at all future Ringling Bros. circuses held at the Verizon Center. Compl. ¶ 30; Ortberg Decl. ¶ 9.

This year, the circus was held from March 24 to March 27, 2011. Compl. ¶ 8. On March 24 and 25, 2011, DARTT members distributed its leaflets as circus-goers left the arena. Riley Decl. ¶¶ 2, 4; Alioto Decl. ¶ 8. Approximately 9,000 people attended the circus on each of those

nights.  Touhey Decl. ¶ 3.  Because so many patrons leave the Verizon Center together immediately after the conclusion of an event, "the period just after an event ends is when crowd control is most challenging and pedestrian safety issues are most significant around the F Street exterior doors."  *Id.* ¶ 10.

On at least one of the evenings, there were approximately seven protesters on hand to distribute fliers.  Euler Decl. ¶ 3.  In addition to leafleting, DARTT members also protested by shouting into a megaphone and by projecting words and images on the side of the Verizon Center.  Alioto Decl. ¶ 8.  Some were holding or wearing signs.  Motions Hearing Transcript ("Tr.") at 37–38, September 8, 2011; Ex. A to Touhey Decl.

On the night of March 24, 2011, Jennifer Riley, a member of DARTT, states that she was handing out leaflets to patrons leaving the circus when a Verizon Center employee told her she could not stand near the door.  Riley Decl. ¶ 2.  Then, "[a]s more people started leaving the Verizon Center, a different Verizon Center employee told me that I needed to move out to the edge of the sidewalk."  *Id*.  Riley claims that from her new location, "I had trouble handing out leaflets … because the circus patrons were not walking near me … [and] would have to walk several feet to get the flier from me."  *Id*. ¶ 3.  Riley also asserts that "[a]t the times that I was closer to the door, more people were accepting fliers from me."  *Id*.  On the same night, another member of DARTT, Robin Euler, was leafleting under the concrete awning at the F Street entrance to the Verizon Center when two security guards told her to move beyond the awning.  Euler Decl. ¶ 2.  One of the security guards informed her that she needed to move because the area of the sidewalk under the awning was private property.  *Id*.

On the next night, March 25, 2011, DARTT members returned to the Verizon Center for another protest.  Euler was again leafleting at the F Street entrance approximately "4 feet from

where the awning ends." *Id.* ¶ 3. An off-duty Metropolitan Police officer, Sgt. Anthony Alioto, told her that she "couldn't stand anywhere on the ground below the awning." *Id.* Euler complied with his order, but she asserts that because she was farther from the door, "[a]bout one-tenth as many people were taking fliers" as compared to when she was standing under the awning. *Id.* ¶ 4. Riley, who was also standing under the overhang distributing leaflets on March 25, was told by Sgt. Alioto that she "could not stand under the overhang" because it was "private property." Riley Decl. ¶ 4. When Riley questioned Sgt. Alioto about whether the strip of sidewalk between the edge of the overhang and sidewalk curb was private property, Sgt. Alioto responded that he did not know. *Id.* Riley moved from under the overhang but complains that she "had trouble handing out leaflets to many of the patrons." *Id.* ¶ 5. She claims that "[m]ore patrons were accepting my leaflets when I was standing under the overhang." *Id.*

By way of background, the Court notes that the following facts are undisputed:

- The F Street doors to the arena are recessed 7 feet 2 inches back from the arena's main façade, and the recessed area is bounded by large concrete columns. Joint Supplemental Statement of Facts at ¶ 1; [Dkt. #35].

- The concrete awning that overhangs both the recessed entrance on F Street and the adjacent sidewalk extends over the sidewalk approximately 23 feet 3 inches from the arena doors. *Id.*

- The edge of the overhang does not correspond to the edge of the sidewalk; there is 9 feet 8 inches of sidewalk remaining between the edge of the 23 foot overhang and the curb directly in front of the doors. *Id.*

- And on the nights in question, even the curb did not mark the edge of pedestrian territory. The parties agree that the patrons exiting the arena were not confined to the sidewalk, and traffic in the street was blocked, as the pedestrians spilled out onto F Street. Tr. at 26–27. So, the five lane street extended the sidewalk well past the 9.5 feet it already extended beyond the overhang. *Id.*

If one turns to the right after exiting the arena on F Street, the sidewalk leads directly to the entrance of the Gallery Place Metro station at the corner of 7th and F Streets, N.W. *See* Ex. 2

4

to Light Decl. Therefore, as is visible from the videotape submitted as evidence, a large percentage of the arena patrons headed in that direction. Ex. A to Touhey Decl.

## STANDARD OF REVIEW

Although defendants move to dismiss or, in the alternative, for summary judgment, summary judgment is the appropriate vehicle here because the Court and the parties rely on matters outside the pleadings.[1] Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). The existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

---

1     Plaintiff has had an opportunity to present evidence outside the pleadings in opposition to defendants' motions. *See Wiley v. Glassman*, 511 F.3d 151, 160 (D.C. Cir. 2007).

## ANALYSIS

### I. Standing

Before addressing the merits of plaintiff's claims, the Court will address whether plaintiff has standing to bring the action at all. "A plaintiff's standing under Article III of the United States Constitution must be determined first in order to establish the jurisdiction of the Court to hear the case . . . [and it] focuses on the complaining party to determine whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *George v. Napolitano*, 693 F. Supp. 2d 125, 129 (D.D.C. 2010) (internal quotation marks and citations omitted). To establish Article III standing, plaintiffs must demonstrate that: "(1) [they have] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 129–30, quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000). "Lack of standing is a defect in subject matter jurisdiction." *Id.* at 128–29, citing *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).

Defendants argued in their papers that plaintiff lacks standing to bring this lawsuit because it has only alleged a hypothetical future injury. WSE's Opp. to Mot. Prelim. Inj. at 7; D.C.'s Am. Mot. to Dismiss at 6–7. They contend that plaintiff can only speculate as to whether defendants would similarly restrict their right to protest at a future event. D.C.'s Mem. at 7. But it is agreed that the Ringling Bros. circus is scheduled to return to the District next year from March 15 to March 18, 2012. WSE's Opp. to Mot. Prelim. Inj. at 2; Touhey Decl. ¶ 4. And plaintiff maintains that the alleged injury is more than hypothetical because DARTT experienced

similar restrictions when it leafleted at the circus for the past three years, *see* Ortberg Decl. ¶ 4 ("In 2010 … we were told by MPD that we could not be under the overhang area") and the organization "definitely plans to do more protests … the next time the circus comes to town," *id*. ¶ 9; Compl. ¶ 30. Defendant District of Columbia essentially conceded plaintiff's standing at the hearing. Tr. at 18–19, 50–51. Given the repetitive nature of the events that gave rise to this lawsuit, the Court will assume for purposes of this motion that plaintiff has demonstrated standing and will proceed to the merits of the case.

## II. First Amendment Framework

The First Amendment to the U.S. Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The Supreme Court has determined that this restriction applies not only to Congress but also to municipal governments. *Lovell v. City of Griffin*, 303 U.S. 444, 450 (1938). However, a city government "may sometimes curtail speech when necessary to advance a significant and legitimate state interest." *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984), citing *Schenck v. United States*, 249 U.S. 47, 52 (1919).

The D.C. Circuit has instructed courts in this district to follow a three step analysis when assessing a First Amendment claim: "[F]irst, determining whether the First Amendment protects the speech at issue, [second,] identifying the nature of the forum, and [third,] assessing whether the . . . justifications for restricting [ ] speech 'satisfy the requisite standard.'" *Mahoney v. Doe*, 642 F.3d 1112, 1116 (D.C. Cir. 2011), quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). The Court will follow this approach to evaluate plaintiff's claims in this case.

A. Plaintiff's Members Were Engaged in Constitutionally Protected Speech

Regarding the first step of the analysis, the parties do not dispute that plaintiff's leafleting activity is constitutionally protected speech. *See Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 358 (1997) ("Leafleting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment ….").

B. The Sidewalk Was a Public Forum

The second step is to determine the nature of the forum where the constitutionally protected activity occurred. The Supreme Court has recognized sidewalks as "quintessential public forums," *International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 696 (1992), that "occupy a privileged position in the hierarchy of First Amendment jurisprudence," *White House Vigil for the ERA Committee v. Clark*, 746 F.2d 1518, 1526–27 (D.C. Cir. 1984). A sidewalk is generally presumed to be a public forum because, similar to streets and parks, it has historically served as a setting for free speech. *See Henderson v. Lujan*, 964 F.2d 1179, 1182 (D.C. Cir. 1992). "[T]he location and purpose of a publicly owned sidewalk is critical to determining whether such a sidewalk constitutes a public forum." *U.S. v. Kokinda*, 497 U.S. 720, 728–29 (1990).

Neither party in this case contends that the sidewalk on either side of F Street is anything but a public forum. But, the record reflects that Verizon Center employees informed Sgt. Alito that the area under the overhang was private property, and that he communicated that understanding to plaintiff's members when he directed them to stand further from the doors. Euler ¶ 3; Riley ¶ 4. At the preliminary injunction stage, WSE did not retreat from that position, and it also argued that because the seven foot recessed area directly outside the arena doors (and

8

under the first portion of the concrete overhang) is part of the Verizon Center leasehold, at least that much constitutes private property. WSE's Opp. to Mot. Prelim. Inj. at 5. WSE characterized this area just outside the doors as "clearly set back from the main façade of the building[,] . . . obviously not part of the thoroughfare sidewalk[,]" and "not a seamless component of the urban grid." *Id*. But the record does not clearly indicate that this was where all of the protesters were located when they were directed to move, and, in any event, they were not simply instructed to move out of the recessed entrance – they were told they could not stand anywhere under the overhang, the majority of which is public property. *See* Compl. ¶ 11; Riley Decl. ¶ 2; Euler Decl. ¶ 3.

Later, in its memorandum in support of its motion for summary judgment, WSE changed tactics and took the position that the Court need not resolve the question of whether any portion of the area under the canopy was private or public property because "'the regulation would be a permissible restriction on speech even in [public] forums.'" WSE's Mem. at 6, quoting *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1306 (D.C. Cir. 2004). The District maintained that the portion of the sidewalk under the overhang was private and that asking plaintiff's members to move onto public property was reasonable. See D.C.'s Am. Mot to Dismiss at 9–10, 14.

Although the Court declined to resolve the legal status of the sidewalk at the preliminary injunction stage, it concludes here that the entire area under the canopy – from which DARTT members were undeniably ordered to move – is a public forum. A review of the photographs and videotapes submitted in evidence makes it clear that there is absolutely no material differentiation between the portions of the sidewalk that are shaded or not shaded by the overhang, or between the recessed and non-recessed portions of the sidewalk. Even though the

paving material changes in the recessed portion, there is no break in the flow of pedestrian traffic and the Verizon Center-owned strip is seamlessly connected to the publicly owned portion of the sidewalk. *See United States v. Grace*, 461 U.S. 171, 180 (1981) (holding that private sidewalk on the outer boundaries of government property was indistinguishable from public sidewalks and therefore qualified as a public forum). Perhaps this is why defendant WSE essentially agreed at oral argument that the law applicable to a public forum is the law applicable in this case. Tr. at 29.

In sum, DARTT members were not on a private sidewalk or driveway. They did not ignore signs advising them that they were on private property, and they did not have to navigate any sort of barrier or separation to get from the sidewalk to where they were standing. They were leafleting on a city street, at the entrance to an arena that is open to the general public. Even if the Court accepts as true WSE's uncontested statement that the recessed strip directly outside of the arena doors belongs to the Verizon Center under the lease agreement, there is no meaningful demarcation of where the Verizon Center's property ends and public property begins such that the DARTT protesters or anyone else would have been aware of the difference. This is particularly true when the sidewalk is packed with pedestrians. Thus, the law applicable to a traditional public forum applies here.

    C. <u>The Restriction Did Not Infringe Upon Plaintiff's Constitutional Rights</u>

The third step in the First Amendment analysis is to assess whether directing the DARTT members to stand beyond the edge of the overhang was permissible under the First Amendment. In a public forum, such as the sidewalk in this case, "the government's ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place and manner restrictions as long as the restrictions 'are content-neutral, are narrowly tailored to

serve a significant government interest, and leave open ample channels of communication.'" *Grace*, 461 U.S. at 17, quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983); *accord Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Cmty. for Creative Non-Violence v. Kerrigan*, 865 F.2d 382, 390 (D.C. Cir. 1989); *A.N.S.W.E.R. Coal. v. Kempthorne*, 537 F. Supp. 2d 183, 194 (D.D.C. 2008).[2]

The record indicates that the protesters were directed to move away from the entrance doors while circus patrons – including many children – were leaving the arena *en masse,* and that they resumed their activities from a point about twenty feet away from the door. The defendants submit that this directive meets the three necessary criteria: that the order constituted a reasonable time, place, and manner restriction that served the government's interest in ensuring the safety of pedestrians, while it also permitted the multi-faceted protest to continue unabated and the message to be delivered.

It is important to emphasize that there is no evidence in the case suggesting that the instructions plaintiff's members received had anything to do with what they had to say. The parties agreed at oral argument that the restriction at issue in this case was content-neutral. Tr. at 39–40; *see also Defending Animal Rights Today and Tomorrow*, 2011 WL 2020788, at *3 n. 3 (noting that the record was devoid of any evidence suggesting that the restrictions on leafleting were related to content of the fliers). Content-neutral regulations are subject to what has been characterized as intermediate scrutiny analysis. *Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of Treasury*, 545 F.3d 4, 12 (D.C. Cir. 2008), citing *United States v. O'Brien*, 391 U.S.

---

2 At oral argument, counsel for the District took the position that the Court need only determine whether the officer's order was reasonable based on the circumstances. Tr. at 19–20; *see also* Supplemental Mem. at 1 [Dkt. # 34]. But reasonableness is only part of the test, and none of the cases that the District has presented to the Court support counsel's formulation.

367, 377 (1968). The Court will therefore consider whether the regulation was narrowly tailored to achieve a substantial government interest, and whether it leaves open ample alternative channels of communication. *Ward*, 491 U.S. at 791.[3]

   *1. Narrowly Tailored*

Was the restriction narrowly tailored to achieve a substantial government interest?[4] The D.C. Circuit has instructed that a content-neutral time, place, or manner restriction is narrowly tailored "'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 519 (D.C. Cir. 2010), quoting *Ward*, 491 U.S. at 799. "But while the regulation 'need not be the least restrictive or least intrusive means,' the regulation may not 'burden substantially more speech than is necessary' to achieve the government's substantial interests." *Id.*, quoting *Ward*, 491 U.S. at 799.

---

3    Plaintiff asks the Court to apply a "somewhat" more stringent test from *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994) instead. That case involved the constitutionality of a thirty-six-foot fixed buffer zone around an abortion clinic, which required protesters at an abortion clinic to move to the other side of the street. *Id.* at 757–60. The Court explained that because the plaintiffs in that case were challenging a court ordered injunction, as opposed to generally applicable ordinance, the normal time, place, and manner analysis was not "sufficiently rigorous." *Id.* at 765. Instead, the Court applied the test of whether the regulation "burden[ed] no more speech than necessary to serve a governmental interest." *Id.* Plaintiff contends that the directive issued by the security personnel on the scene in this case is more like an injunction than a local ordinance, and it cites *McTernan v. City of York*, 564 F.3d 636, 654 (3rd Cir. 2009), where the Third Circuit used the *Madsen* test to evaluate the constitutionality of an oral police directive. Pl.'s Opp. to D.C.'s Am. Mot. to Dismiss at 8. The Court need not resolve the issue of whether the *Madsen* test should apply in this instance because, even if it did, the Court would find that no constitutional violation occurred. Also, despite the position plaintiff advanced in its written oppositions, and the language in *Madsen* suggesting that an injunction may not burden more speech than necessary, 512 U.S. at 765, plaintiff agreed at the hearing that the restriction need *not* be the least restrictive alternative, as long as it is in the "zone of constitutionality," Tr. at 40. This is consistent with the law in this Circuit.

4    Other courts use the terms "substantial governmental interest" and "significant government interest" interchangeably. *See, e.g.*, *Ward*, 491 U.S. at 781; *Clark*, 468 U.S. at 288.

> *a. The Government Had a Substantial Interest in Ensuring Pedestrian Safety and the Orderly Flow of Traffic After the Circus*

Defendants maintain that the government had a substantial interest in "ensuring pedestrian safety and orderly traffic flow outside of the Verizon Center at the conclusion of the Circus." WSE's Mem. at 9. The Supreme Court has determined that the government's interest in "avoiding congestion and maintaining the orderly movement of [ ] patrons" is "sufficient to satisfy the requirement that a place or manner restriction must serve a substantial state interest." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 652, 654 (1981); *see also Schenck*, 519 U.S. at 376 (finding that the government has a valid interest in "promoting the free flow of traffic on streets and sidewalks").

The record shows that more than 9,000 people attended the circus on each of the nights in question, Touhey Decl. ¶ 3, that they exited together at the conclusion of the event, *id*. ¶ 10, and that the substantial majority of the patrons departed through the bank of doors on F Street. Tr. at 34. At the hearing, the Court reviewed footage from surveillance video from the nights in question and observed a large crowd of people streaming out of the Verizon Center and at least one DARTT protester handing out materials near the door. Tr. at 5, 7, 14; Ex. A to Touhey Decl. The video reflects that she was originally positioned in the middle of crowd such that exiting patrons found it necessary to walk around her. Ex. A to Touhey Decl.

Plaintiff argues that the government must establish that the leafleters actually impeded the flow of people and that there was a demonstrated need for the restriction before it was imposed. Pl.'s Opp. D.C.'s Am. Mot. to Dismiss at 11, quoting *Kuba v. Marine World Joint Powers Auth.*, No. S-05-0794 WBS JFM, 2006 U.S. Dist. LEXIS 33566, at *15–16 (E.D. Cal. May 17, 2006). But there is no such prerequisite; the Supreme Court has explained that simply

reducing a risk can suffice as a governmental interest. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 296–97 (1984).

In *Clark*, the Court addressed a regulation that prohibited individuals from sleeping in parks throughout the District of Columbia. In discussing the threat addressed by the rule, the Court noted that "it is evident from our cases that the validity of this regulation need not be judged solely by reference to the demonstration at hand." *Id*. Instead, it was completely appropriate for the Court to consider how "[a]bsent the prohibition on sleeping, there would be other groups who would demand permission to deliver an asserted message by camping in Lafayette Park." *Id.* at 297. In other words, the Court considered the validity of a regulation based on the potential for harm, not just harm actually caused. *Id.* ("If the Government has a legitimate interest in ensuring that the National Parks are adequately protected … and if the parks would be more *exposed* to harm without the sleeping prohibition than with it, the ban is safe from invalidation under the First Amendment …. ") (emphasis added). Given the substantial safety risks involved if the flow of exiting patrons was impeded, the Court agrees with defendants that the government had a significant interest in promoting public safety by ensuring the orderly traffic flow of pedestrians at the conclusion of the circus. *See Heffron*, 452 U.S. at 650.

### b. The Restriction Was Narrowly Tailored

The narrow tailoring inquiry requires that there be a "*real nexus* between the challenged regulation and the significant governmental interest sought to be served by the regulation." *Kerrigan*, 865 F.2d at 388. "It is not enough … that a governmental interest is significant; rather, it must be shown that a reasonable regulation is narrowly tailored *to substantially serve* a significant government interest." *A.N.S.W.E.R. Coal.*, 537 F. Supp. 2d at 195, quoting *Cmty. for*

14

*Creative Non-Violence*, 468 U.S. at 388. According to defendants, the restriction was narrowly tailored because it did not completely prevent plaintiff's members from engaging in protected speech. D.C.'s Am. Mot. to Dismiss at 13. Rather, it only required them to move "a few feet away" and did not stop the protesters "from reaching [their] intended audience." *Id*.

Plaintiff's members have complained that the distance they were asked to move was too great,[5] and they assert that they were unable to reach a sufficient number of the departing patrons after they complied with the order to move to the edge of the canopy. Euler Decl. ¶ 4; Riley Decl. ¶ 3. But the objective evidence – the surveillance footage reviewed by the Court – undermines this contention. The video shows that the people who flowed out of the doors into the area shaded by the canopy continued to move briskly out from under it; they either continued walking straight forward onto the uncovered sidewalk and street, or they turned right and proceded up the uncovered sidewalk towards the Metro at the corner of 7th and F Streets. Ex. A to Touhey Decl. Protesters standing at any point between the western edge of the overhang and the Metro were smack in the middle of pedestrian traffic that turned right after exiting the arena. And protesters who stood between the southern edge of the overhang and F Street were standing in the midst of the pedestrians who walked straight. This is especially true given that F Street was blocked to traffic and the pedestrian area extended all the way across the street to the opposite sidewalk. Tr. at 26–27. The fact is that DARTT's members were not relegated to some

---

5     Robin Euler asserts that she was forced to move "really far" from her original position, which she estimated was approximately four feet from where the awning ended. Euler Decl. ¶¶ 3–4. She repositioned herself at a spot on the sidewalk that was not underneath the awning. But based on the measurements to which the parties have agreed, if Euler was originally standing four feet from the edge of the awning, and the sidewalk between the end of the awning and the street was 9 feet wide, *see* Joint Supplemental Statement of Facts ¶ 1, then Euler was forced to move, at the least, only four feet further from the door, and at the most – if she went all the way to the curb – only 13 feet. Thus, the distances involved in this case were hardly substantial.

distant location at the edge of the action, trying to flag down members of the crowd after they had already dispersed; they were standing in a sea of pedestrians even at their new location.

Plaintiff characterizes the restriction as an impermissible "20 foot buffer zone," Tr. at 37, and it points the Court to cases such as *Madsen,* 512 U.S. at 753, where the protesters were physically separated from the people they were trying to persuade by a space they could not enter. *See also Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850, 863 (9th Cir. 2004) (rule stationing leafleters 200 feet from the fair entrance was overbroad; "[c]ordoning protesters off in a free expression zone … far from encourages interaction with them, [and] is more likely to give the impression to passersby that these people are to be avoided."). But here, both the metaphor and the cases are inapposite. Plaintiff's members were not separated from their intended audience by 20 feet – they were told to stand 20 feet from the *door.* As the video shows, the protesters were fully integrated into the crowd of circus-goers who, while emptying the Verizon Center, filled not only the area under the overhang, but the entire sidewalk. Ex. A to Touhey Decl; Tr. at 5, 7, 14.

Plaintiff next argues that the restriction was not narrowly tailored because it resulted in the distribution of fewer leaflets than the protesters would have been able to place in patrons' hands had they remained in their original location under the canopy. According to Robin Euler, in her new spot, "people would have to go out of their way to get a flier," and "about one-tenth as many people" took them. Euler Decl. ¶ 4. Another DARTT member, Jennifer Riley, agreed that "[b]y not being able to be on the portion of the sidewalk under the overhang, I had trouble handing out leaflets to many of the patrons." Riley Decl. ¶ 5. She states that "[m]ore patrons were accepting my leaflets when I was standing under the overhang." *Id*.

Even if the Court resolves all factual disputes in plaintiff's favor and accepts these somewhat subjective complaints at face value,[6] the declarations do not give rise to a constitutional violation. Although leafleting is a pure form of protected speech that occupies a valued place in American history, *see Jamison v. Texas*, 318 U.S. 413, 416 (1943), plaintiff does not have an unlimited constitutional right to leaflet anywhere or at any time it decides to do so, *Cornelius v. NAACP Legal Def. and Educ. Fund., Inc.*, 473 U.S. 788, 799–800 (1985) ("Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities."); *Cox v. Louisiana*, 379 U.S. 536, 554 (1965) (collecting Supreme Court cases to show the long standing principle that "[t]he rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time"). Plaintiff's members did not necessarily have a right to leaflet at the most advantageous spot or even a "more" advantageous spot than at the edge of overhang. Indeed, plaintiff acknowledges in its complaint that "[m]embers of DARTT had every right to leaflet anywhere they chose on the sidewalk, provided that they were not blocking egress or ingress or incommoding passersby [sic]"), Compl. ¶ 19, and at oral argument, counsel for the plaintiff agreed that its members had no right to force its pamphlets on those who did not wish to receive them. Tr. at 34.

Plaintiff cites a number of cases in arguing that the restriction burdened more speech than necessary. *See Turner v. Plafond*, No. C 09-00683 MHP, 2011 U.S. Dist. LEXIS 1718, at *58

---

6     The characterization of the events in the declarations does not create a genuine issue of material fact for trial given the undisputed video evidence that shows the protesters were able to press their leaflets on a number of the patrons. Ex. A to Touhey Decl; Tr. at 5–6.

17

(N.D. Cal. Jan. 7, 2011); *Marine World*, 2006 U.S. Dist. LEXIS 33566, at *1; *Halfpap v. City of W. Palm Beach*, No. 05-80900-CIV, 2006 U.S. Dist. LEXIS 97428, at *69–70 (S.D. Fla. Apr. 12, 2006). But all of these cases dealt with total bans on expressive activity that bear no relationship to what took place. Here, the protesters were forced to move only a few feet away from where they originally stood, and there was nothing separating them from the circus attendees. They continued to distribute their leaflets in their new location. Plaintiff suggests that defendants could have chosen a less restrictive means of achieving its objectives, such as limiting the number of protesters under the canopy to one or two individuals. Pl.'s Opp. D.C.'s Am. Mot. to Dismiss at 9. But as the Supreme Court has observed, "when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal." *Hill v. Colorado*, 530 U.S. 703, 726 (2000); *see also Am. Library Ass'n v. Reno*, 33 F.3d 78, 88 (D.C. Cir. 1994). In light of those precedents, the Court concludes that the direction at issue was sufficiently narrowly tailored to further the significant government interest in ensuring pedestrian safety.

        2. *Ample Alternative Channels of Communication*

Most important, even if DARTT members in fact reached a smaller percentage of the crowd with their written literature after they moved out from under the overhang, they successfully communicated their message audibly with a megaphone and visually with signs and a giant, graphic video projection on the side of the building. Alioto Decl. ¶ 8; Ex. A to Touhey

Decl.[7] Thus, the Court finds that the restriction left open multiple effective alternative channels of communication. *ISKCON of Potomac, Inc. v. Kennedy*, 61 F.3d 949, 958 (D.C. Cir. 1995).[8]

## CONCLUSION

Given the undisputed facts, the Court agrees with defendants that it is difficult to find support for plaintiff's argument that its members' constitutional rights under the First Amendment were burdened at all, much less that they were burdened more than necessary. The protesters had direct access to a large crowd of circus-goers as they left the Verizon Center, and they were not separated from them by any kind of barricade or buffer zone. The protesters were simply moved to another area of the public sidewalk that was well within the line of sight and hearing of the patrons leaving the Verizon Center. They continued to leaflet and communicated their message of protest by shouting into a megaphone, holding signs, and projecting images onto the side of the building. Because the Court finds that these circumstances do not amount to an infringement of plaintiff's constitutional rights, it does not need to reach the issues of

---

7   Plaintiff takes great pride in this accomplishment on its website and it was noted elsewhere on the internet. *See DARTT, http://dartt-online.org* (last visited Oct. 19, 2011) (providing a link to youtube.com under "Video links" that demonstrates their protests) and *http://www.youtube.com/watch?v=qRf1cBRcLmw* (last visited Oct. 19, 2011) ("On the 24th of March, animal rights activists projected horrific images of the abuse of animals by circuses … on the wall of the Verizon Center … Now ain't that something … the circus is performing here at the Verizon Center and here on the wall of the Verizon Center is being shown a video … on the side of their own building! … If we can do it to the FBI, we can do it to you … The video continues to run … no trouble from security …. "); *see also* DC Direct Action News, *http://dcdirectactionnews.wordpress.com/2011/03/26/video-of-circus-animal-abuse-projected-on-verizon-center-during-circus/* (last visited Oct. 19, 2011) *(*"Huge crowds then streamed out, and while many walked right by the huge video presentation, others found the footage too compelling to ignore, so they stayed to watch.")

8   The Court could treat this element as conceded because plaintiff does not address it in its papers. *Bryant v. PEPCO*, 730 F. Supp. 2d 25, 29 (D.D.C. 2010).

municipal liability or state action. Since plaintiff's motion for leave to amend [Dkt. #26] sought leave to add allegations related only to these issues, it will be denied as moot.

Accordingly, the Court will grant defendants' motions to dismiss the complaint or in the alternative, for summary judgment [Dkt. #17 and #19].[9] This case will be dismissed with prejudice. A separate order will issue.

/s/ Amy B Jackson

AMY BERMAN JACKSON
United States District Judge

DATE: October 20, 2011

---

9   The District originally filed a motion to dismiss, or in the alternative, for summary judgment [Dkt. #16] but later filed an amended motion. The original motion will be denied as moot.